UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:22-cr-165-MOC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| SUDIPTA MAZUMDER | ) | |
| | ) | |
| _____ | ) | |

NOW COMES the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and hereby submits this sentencing memorandum, and respectfully suggests that a custodial sentence is necessary to achieve the goals of sentencing in this case.

## BACKGROUND AND PROCEDURAL HISTORY

Barton & Associates, a medical staffing agency, and its DME manufacturer clients orchestrated a multi-million dollar telemedicine fraud scheme to steal money from Medicare and TRICARE by prescribing medically unnecessary medical braces and other durable medical equipment (DME) to Medicare and TRICARE beneficiaries. To effect the scheme, Barton's telemarketers solicited information from Medicare beneficiaries and populated template medical orders for DME with information purportedly describing the beneficiaries' medical need for the braces. Because Medicare and TRICARE require that claims seeking reimbursement identify the medical provider ordering the DME, Barton developed a network of licensed medical providers in states around the country to sign the pre-populated orders without the provider ever having seen the beneficiary. That scheme could not operate without one critical element: the signature of a licensed medical practitioner falsely certifying that the braces were reasonable and medically necessary based on the practitioner's assessment of the beneficiary's individual physical condition.

1

Defendant Sudipta Mazumder, a licensed doctor, worked part-time for Barton from around January 2019 until around May 2020. The evidence at trial established that during that period, Defendant signed at least 3,263 orders for over 15,000 pieces of medically unnecessary DME for thousands of Medicare and TRICARE beneficiaries. (*See* Trial Tr., Doc. 117, at p. 164 ll. 15-19.) Each order contained numerous false statements and false certifications that Defendant herself had determined that the DME was medically necessary in the course of her treatment of the beneficiaries, when, in truth and in fact, the Defendant had never met, seen, or treated nearly any of the beneficiaries for whom she ordered DME. (*Id.*; *see, e.g.*, Gov't Ex. 11.)

On June 22, 2022, Defendant was charged in a seven count Bill of Indictment. (Doc. 1.) Count One charged Defendant with one violation of 18 U.S.C. § 1347 for her role in the overarching scheme. Counts Two through Seven charged Defendant with making specific false statements relating to health care matters, in violation of 18 U.S.C. § 1035(a), by signing false DME orders that were submitted to Medicare and/or TRICARE related to six particular beneficiaries. A Superseding Indictment was returned on August 16, 2022, charging Mazumder with an additional count of health care fraud in violation of 18 U.S.C. § 1347, alleging that she executed a scheme to defraud Medicare by concealing that she continued to render services to Medicare beneficiaries after her Medicare enrollment and billing privileges had been revoked. (Doc. 15.)

In her defense, Defendant presented evidence that she lacked knowledge of Barton's overarching fraud scheme and that she believed her role in the preparation and signing of the fraudulent orders was limited to chart review. On September 26, 2023, Defendant was found guilty at trial on Counts Two through Seven arising out of her signing of false medical orders for the six beneficiaries charged in the Superseding Indictment, and not guilty on Counts One and Eight.

2

(Verdict, Doc. 92.)

Medicare was billed $10,362,317.13 for claims arising out of the false orders Defendant signed, and Medicare actually paid $5,700,207.84 on those claims. (PSR, Doc. 112 ¶¶ 33-34.) TRICARE was billed $509,434.31 for claims arising out of the false orders Defendant signed and actually paid $59,512.62 for such claims. (*Id.* at ¶¶ 35-36.) Defendant was paid $70,760 for her role in the scheme. (*Id.* at ¶ 37.)

## **LEGAL STANDARD**

In determining the appropriate sentence, "a district court must begin by correctly calculating the applicable Guidelines range." *United States v. Evans*, 526 F.3d 155, 160 (4th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The advisory Guidelines are "the starting point and the initial benchmark." *Gall* at 49. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice. . . [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). "[A] Guidelines sentence will usually be reasonable, because it reflects both the Commission's and the sentencing court's judgment as to what is an appropriate sentence for a given offender." *Id.* at 351. Ultimately, however, the appropriate sentence is for the District Court to determine based on the factors enumerated in 18 U.S.C. § 3553(a), and "any sentence, within or outside of the Guidelines range, as a result of a departure or of a variance, must be reviewed by appellate courts for reasonableness pursuant to an abuse of discretion standard." *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011).

It is well-established that "[s]entencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as th[e] Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict."

*United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008); *United States v. Godwin*, 272 F.3d 659, 671 (4th Cir. 2001); *see also United States v. Shephard*, 892 F.3d 666, 673 (4th Cir. 2018) (citations omitted) (The government must establish the loss amount by a preponderance of the evidence, but the court need only make a "reasonable estimate" of the loss).

## PSR OBJECTIONS

As set forth in the PSR, Section 2B1.1 of the Guidelines is applicable to violations of 18 U.S.C. § 1035(a). That section provides for a base offense level of 6, and the trial evidence supports the application of the following enhancements found in the PSR, which are addressed herein:

(1)      a 20-level increase for loss exceeding $9.5 million, pursuant to §2B1.1(b)(1)(K);

(2)      a two-level increase because the offense involved ten or more victims and was committed through mass marketing, pursuant to §2B1.1(b)(2)(A);

(3)      a three-level increase because the Defendant was convicted of a federal health care offense involving Medicare, a Government health care program, and the loss exceeded $7 million, pursuant to §2B1.1(b)(7)(i); and

(4)      a two-level increase because the Defendant abused a position of trust and used a special skill, pursuant to §3B1.3.

(PSR ¶¶ 49-56.) Application of these enhancements, and the Zero-Point Offender reduction, results in a total offense level of 31. (*Id.* at ¶ 59.)

Defendant submitted four objections to the above enhancements found in the PSR. For the reasons set forth below, the Court should overrule Defendant's objections and adopt the calculation of the Guidelines as set forth in the PSR.

4

**1.** **The uncharged false orders Defendant signed, which were substantially the same as the charged false orders, must be included as relevant conduct under the Guidelines.**

Defendant first objects to the inclusion of the more than 3,000 false orders not individually charged in the Superseding Indictment as relevant conduct, arguing that only the false orders specifically charged in Counts Two through Seven of the Superseding Indictment can be included in the loss calculation. (Def. Obj. Draft PSR, Doc. 108 at ¶¶ 2-3, 6-7.) Defendant's argument fails because it ignores that relevant conduct includes similar uncharged conduct within a common plan.

The Sentencing Guidelines implement a two-step process for determining the total offense guideline. The first step is to determine the offense guideline applicable to the offense of conviction. U.S.S.G. § 1B1.2(a). The second step is to determine the applicable guideline range when considering relevant conduct. *Id.* at § (b). Relevant conduct is defined as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]" U.S.S.G. § 1B1.3(a)(1)(A). Because health care fraud false statement counts group, relevant conduct also includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* at § 1B1.3(a)(2). "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." *Id.* at cmt. n. at backg'd.

Here, Defendant was convicted of making six false statements to Medicare and TRICARE arising out of her act of signing six template false orders; the 3,000-plus false orders that Defendant signed but were not separately charged are part of the "same course of conduct or common scheme or plan" as the charged orders. Defendant's conduct was the same as to all orders, whether charged

5

or uncharged; Defendant electronically received pre-filled false orders and quickly signed them without examining the listed beneficiary or making the medical necessity determinations she represented, and Defendant's co-conspirators submitted the associated claims to Medicare and TRICARE. The Government is not required to charge, and the jury is not required to individually consider, an indictment containing 3,263 separate yet functionally identical counts, necessitating the trial testimony of thousands of beneficiaries, simply for the additional orders to be included in the Guidelines calculation. That uncharged, substantially identical false orders are relevant conduct as to charged false orders within the same criminal plan is nigh-axiomatic, and failing to consider them as relevant conduct is reversible error. *See, e.g.*, *United States v. Hayes*, 322 F.3d 792, 802 (4th Cir. 2003) (vacating sentence, in tax preparer case, where sentencing court did not consider uncharged false tax returns as relevant conduct); *United States v. Wynne*, 989 F.2d 497 (4th Cir. 1993) (vacating sentence where sentencing court failed to consider two uncharged false statements to banks as relevant conduct where bill of information charged two other false statements to different banks because false statements were part of the same course of conduct or common scheme or plan). Accordingly, the uncharged orders are necessarily considered in determining the loss amount and other enhancements.

Defendant attempts to avoid this conclusion by claiming that the uncharged false statements are acquitted conduct rather than uncharged conduct. Defendant's argument fails under the Guidelines, which define acquitted conduct as "conduct for which the defendant was criminally charged and acquitted in federal court[.]" U.S.S.G. §1B1.3(c). Defendant was not charged with the 3,000-plus other false orders she signed. They simply cannot constitute acquitted conduct and are properly characterized as uncharged conduct.[1]

---

[1] Defendant's argument that the Court is prohibited from considering the facts of the health care

**2.**      **The Section 2B1.1(b)(2)(A) enhancement applies under both the ten-or-more victim subsection and the mass-marketing subsection.**

     **a.**      **The offense involved ten or more victims.**

Defendant next challenges the application of the two-level enhancement at U.S.S.G. §2B1.1(b)(2)(A) under subsection (i), which applies when the offense involves ten or more victims. (Def. Obj. Draft PSR, Doc. 108 at ¶ 5.) Defendant argues that the beneficiaries whose identities were used on the false orders are not classified as victims because they did not suffer "bodily injury and/or monetary harm." (*Id.*) Defendant's argument fails under the Guidelines; the beneficiaries are victims because Defendant unlawfully used their personally-identifying information without authorization in the offense.[2]

As an initial matter, the Court need not reach the application notes in resolving this objection because Section 2B1.1 itself has a plain and unambiguous meaning when it calls for a two-level enhancement for offenses involving ten or more victims. It is unambiguous that individuals whose identities were stolen and used in the offense are victims under the Guidelines. *See United States v. Pearson*, No. 23-4318, 2025 WL 3776124, at *3 (4th Cir. Dec. 30, 2025) (finding that the word victim in the Guidelines unambiguously covers clients of insurance agent despite the clients ultimately being reimbursed for their pecuniary damages); *see also United States v. O'Lear*, 90 F.4th 519 (6th Cir. 2024) (holding numerous elderly and dependent nursing home patients had "victim" status under §3A1.1 where defendant misused the identities of these patients to carry out his fraud on the Medicare and Medicaid programs).

---

fraud scheme because it is not relevant conduct also drastically undercuts her argument that she had a mitigating role in the offense.

[2] Defendant's secondary argument, that there were fewer than 10 beneficiaries because only the beneficiaries charged in the indictment are countable, also fails because the uncharged orders are relevant conduct.

Regardless, even if the Court were to look to the commentary for clarification on the meaning of the word victim, the same result would follow. Application Note 4(E) defines "victim" as either (1) any person who "sustained any part of the actual loss" or "suffered bodily injury as a result of the offense," or (2) "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. §2B1.1 cmt. nn.1, 4(E). For purposes of this second definition of victim, a "means of identification" is "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1028(d)(7) (incorporated by U.S.S.G. §2B1.1 cmt. n.1).

The evidence at trial established that Defendant used the name, Medicare numbers, and other personally-identifying information of over 3,000 Medicare beneficiaries. None of these uses were authorized by the beneficiaries, nor was it lawful. Accordingly, this enhancement is properly applied regardless of whether the victims suffered pecuniary harm. *See Pearson*, 2025 WL 3776124, at *4 (affirming application of enhancement under this definition of victim where financial advisor used more than ten client names on loan disbursement request forms without authorization).

### b. Defendant knew the offense was committed through mass-marketing.

Defendant also objects to the application of Section 2B1.1(b)(2)(A) enhancement under subsection (ii), which applies when the offense "was committed through mass-marketing." (Def. Obj. Draft PSR, Doc. 108 at ¶ 4.) Defendant argues that she was not aware that telemarketing was involved in the offense. Defendant's objection fails because there is evidence that she was aware of the mass-marketing and because the acts of her co-conspirators can be considered as relevant conduct.

As a threshold matter, the Court need not reach this basis for applying the enhancement under Section 2B1.1(b)(2)(A) because the ten-or-more-victim subsection (i) applies as set forth in Section B above. Regardless, the enhancement also applies under subsection (ii) because the trial evidence established that Defendant knew that the offense involved mass marketing.

For purposes of the two-level enhancement provided for by §2B1.1(b)(2), "mass marketing" means:

> [A] plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services … "Mass marketing" includes, for example, a telemarketing campaign that solicits a large number of individuals to purchase fraudulent life insurance policies.

§ 2B1.1 cmt. n. 4(A); *United States v. Sniffen*, 2021 WL 5150048, at *2 (4th Cir. Nov. 5, 2021) (finding no clear error in the district court's decision to apply a two-level Guidelines enhancement because the sweepstakes fraud was committed through a telemarketing scheme).

The text of the enhancement does not state that the mass marketing must be directed at victims; however, currently, there is a circuit split as to whether this enhancement applies when mass marketing was used during the commission of an offense, but directed towards third parties (*i.e.* not the pecuniary victims). *See United States v. Moran*, 778 F.3d 942, 975-76 (11th Cir. 2015) (affirming application of enhancement in health care fraud case where evidence demonstrated patient recruiters engaged in mass-marketing by targeting Medicare beneficiaries to participate in treatments); *United States v. Isiwele*, 635 F.3d 196, 198 (5th Cir. 2011) (affirming application of enhancement in health care fraud case where evidence demonstrated defendant hired a recruiter to gather information from Medicare and Medicaid beneficiaries in order to bill for medically unnecessary wheelchairs); *United States v. Mauskar*, 557 F.3d 219, 233 (5th Cir. 2009) (rejecting defendant medical provider's argument that enhancement was not applicable because he did not

9

personally participate in the mass-marketing of patients); *but see United States v. Lacey*, 699 F.3d 710, 712 (2d Cir. 2012) (finding that mass-marketing must be directed towards the victims for enhancement to apply); *United States v. Miller*, 588 F.3d 560, 562 (8th Cir. 2009) (same).

To date, the Fourth Circuit does not appear to have limited the application of the mass-marketing enhancement to cases where the victim—here, Medicare—was the direct target or recipient of the mass-marketing solicitations. *See also United States v. Bolos*, Case No. 2:18–CR–140, 2022 WL 1751651, at *6 (E.D. Tenn. May 31, 2022) (applying the enhancement, expressly noting "[n]o limitations based on the victims exists in the Guideline.").

Here, the Court should apply a two-level enhancement because the use of mass marketing to identify Medicare and TRICARE beneficiaries was integral to the success of the fraud scheme, as Defendant well knew. The fact that this scheme was accomplished by mass marketing was readily apparent, as each of the orders state on their face that the information was input by an "intake rep." (*See, e.g.*, Gov't Ex. 11.) It is also plainly obvious from the mechanics of the scheme itself; Defendant cannot have ordered DME for over 3,000 beneficiaries in a little over a year without mass outreach. This was a volume-based scheme, wherein everyone (including Defendant) profited off the high volume of DME ordered for a high volume of Medicare beneficiaries recruited by Barton and/or its clients through telemarketing solicitations.

Moreover, under U.S.S.G. §1B1.3(a)(1)(B), the acts of Defendant's co-conspirators in conducting the telemarketing may be considered as relevant conduct because it was part of the common scheme leading to Defendant's false statements. *See Moran* at 975-76 (applying enhancement in health care fraud case where doctor defendant signed false notes falsely stating he examined patients, who were identified by co-conspirator through mass marketing); *Isiwele* at 205 (finding doctor eligible for mass-marketing enhancement based on another's face-to-face

10

recruitment of Medicare beneficiaries).

### 3. Defendant is not entitled to a mitigating role adjustment.

Finally, Defendant objects to the lack of inclusion of a mitigating role adjustment in the PSR. (Def. Obj. Draft PSR, Doc. 108 at ¶ 7.)

The Guidelines set forth a non-exhaustive list of factors for the sentencing court to consider in determining whether a role adjustment is warranted:

(i)     the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)     the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. §3B1.2 cmt. n. 3(C). Each of these factors weigh against Defendant receiving a role adjustment.

Defendant, and not any co-conspirators, is the doctor who falsely certified that she actually examined the patients and determined that the orders were medically necessary when she did not do so. Defendant is the only person whose name and signature appears on the false statements. Defendant's NPI and other information was supplied in connection with the claim to Medicare for

11

reimbursement purposes—and was necessary to the success of those claims. Signing the false orders was Defendant's choice alone, and she was paid per false order she signed.

The Government does not dispute that Defendant's role in the overarching health care fraud scheme was finite. Defendant, however, was the only actor who made false representations to Medicare, which is the offense of conviction. Without Defendant's willingness to sell her Medicare credentials and signature, Barton and the DME manufacturers could not have successfully billed Medicare. That Defendant's conduct in this regard was egregious is sufficiently demonstrated by the 3,000-plus orders she signed in a barely more than a year.

Defendant argues that she is entitled to a role adjustment because she "did not have any involvement in obtaining [] information from patient-beneficiaries and did not complete any section of the orders, except for her signature." (PSR, Doc. 122 at p. 23.) But that lack of involvement is the crux of the offense: had she examined the beneficiaries, obtained their correct medical information and input it into the medical records, then no crime would have occurred.

Although Defendant did not design or develop the overarching fraud scheme, she was the only person who made the false statements, and her involvement was essential for the claims to be paid. A minor role adjustment is inappropriate.

**APPLICATION OF THE 18 U.S.C. § 3553(a) SENTENCING FACTORS**

A custodial sentence is sufficient, but not greater than necessary, to satisfy the goals of sentencing, including (a) the nature and circumstances and seriousness of the offense; (b) the promotion of respect for the law; (c) just punishment; and (d) the need to deter Defendant, and other licensed medical professionals, from similar abusive conduct with respect to the Medicare and other federally-subsidized health care programs, as well as the patients they serve.

Three considerations highlight the seriousness of Defendant's offense. First, Defendant was the gatekeeper whose false statements served to relinquish the key for fraudulent companies to steal nearly $6 million from the Medicare program in a short period of time. While Defendant received much less personal gain relative to both (a) the staggering loss her false orders caused to the Medicare program and (b) the millions of dollars that other bad actors presumably pocketed, Defendant still received over $70,000 in a little over a year for the so-called work of repeatedly clicking a button affixing her electronic signature on thousands of documents falsely stating that she had cared for the patients. This disparity, *i.e.* Defendant's failure to obtain a better margin from her false orders, does not lessen the seriousness of her offense. The losses to Medicare and TRICARE are alarming and would not have occurred without Defendant's willingness to execute false orders for easy money.

Second, over 3,000 Medicare and TRICARE beneficiaries suffered from identity theft due to Defendant's conduct. The large number of victims that Defendant's conduct affected is serious in and of itself. And although their harm was minor and non-pecuniary, several beneficiaries testified to the difficulties Defendant's offense caused them.

Third, licensed medical professionals like Defendant hold positions of trust with respect to the patients they serve, and Medicare-enrolled providers additionally hold a position of trust with respect to the federal health care program. Medicare-enrolled providers have sworn to ensure patient safety and, when interacting with Medicare beneficiaries, abide by the laws, policies, procedures, rules, and regulations governing the Medicare program. Furthermore, Medicare-enrolled providers explicitly certify that they will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity. Defendant made these certifications when

13

she enrolled in Medicare, and actively abused the trust conferred by her Medicare enrollment status when she accepted payments from Barton in exchange for allowing it to exploit her signature and credentials.

Medicare-enrolled providers are the gatekeepers to the Medicare Trust Fund. Defendant's willingness to sell her signature and order DME in bulk with the click of a button for individuals she had never met, seen, talked to or treated, and create or adopt false medical records in connection with the submission of claims to Medicare, underscores the need for both specific and general deterrence.

This was a crime of greed, convenience and opportunity. The need to deter both Defendant and other medical professionals from similarly exploiting their medical licenses or positions of trust and skills, and selling signatures in this manner is significant. The Court's sentence in this matter should serve as a reminder to North Carolina licensed medical professionals and Medicare enrollees that both health care, generally, and the Medicare Program are honor or trust-based systems that rely on the honesty and integrity of medical practitioners. Medical practitioners who abuse this trust placed into them by the federal government and the general public will be held accountable.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully recommends that the Court apply the PSR as drafted and sentence Defendant to a custodial sentence.

14

Respectfully submitted on June 1, 2026.

RUSS FERGUSON
UNITED STATES ATTORNEY

/s/ **Graham Billings**
NC Bar Number 55972

/s/ **Katherine Armstrong**
NC Bar Number 36305

Assistant United States Attorneys
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: 704.344.6222

15

**<u>CERTIFICATION</u>**

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Executed on June 1, 2026.


<u>s/Graham Billings</u>
Graham Billings
Assistant United States Attorney

16